John BROWN, Petitioner,

v.

Harold J. SMITH, Warden, Attica Correctional Facility, Respondent.

No. 78 Civ. 2220.

United States District Court,
S. D. New York.

April 24, 1979.

Jay Goldberg, New York City, for petitioner.

Ellen Marks, Asst. Atty. Gen., New York City, for respondent.

## MEMORANDUM AND ORDER

WHITMAN KNAPP, District Judge.

On November 19, 1975 petitioner John Brown was convicted of assault in the first degree and sentenced to an indeterminate term of imprisonment no greater than fifteen years and no less than seven and one-half years. His conviction was unanimously affirmed by the Appellate Division, First Department, on December 15, 1977. Leave to appeal to the New York Court of Appeals was denied January 26, 1978.

In this petition for a writ of habeas corpus five claims are presented: 1) Petitioner was denied due process of law in that his decision to waive his right to counsel and to proceed pro se was neither knowingly nor intelligently made. 2) Petitioner was deprived of effective assistance of counsel. 3) The verdict was against the weight of the evidence. 4) The trial court committed reversible error in failing to comply with the jury's request to read testimony. 5) Petitioner, while conducting his own defense, was denied effective assistance of counsel.

We find that petitioner's decision to proceed pro se was neither knowingly nor intelligently made, and therefore we need not consider his other claims, but must sustain the writ on that ground alone.

### The Facts

On January 9, 1975, the Grand Jury of Bronx County filed an indictment against petitioner for the crimes of attempted murder in the second degree, assault in the first degree and criminal possession of a weapon in the second degree. On May 6, 1975, a *Wade* hearing was held on the petitioner's motion to preclude complainant Anthony Wingate from making an in-court identification at trial based upon allegedly suggestive pre-trial photo identification procedure. Petitioner conducted the *Wade* hearing *pro se,* but there is no contention that the Justice presiding made any attempt to question or advise the petitioner about the hazards of representing himself.

On October 1, 1975, when petitioner's trial was scheduled to begin, Alvin Morris, Esq., his court-appointed attorney, opened the proceedings by asserting that the petitioner had notified him upon his arrival at court that morning that he did not wish Mr. Morris to represent him, but rather had decided to appear *pro se.* The Court, upon learning of petitioner's decision to conduct his own defense, engaged in the following colloquy with him:

"The Court: Mr. Brown [petitioner] it is your wish to represent yourself?

Mr. Brown: That's right, sir.

The Court: Are you familiar with judicial or court proceedings?

Mr. Brown: I believe I am to a certain extent. That's why I asked that the Court assign another attorney to advise me as I go along.

The Court: Have you been subject to other proceedings in the past?

Mr. Brown: Have I been subject . .

The Court: Yeah, have you ever been—

Mr. Brown: No, I have never represented myself if that's what you mean.

The Court: Have you ever been on trial before?

Mr. Brown: Yes, I have.

The Court: Basically you are familiar with the general decorum of the courtroom, the procedure and who and how everything is done.

Mr. Brown: That's right.

The Court: I assume from your application you, of course, will comply with the usual courtroom decorum and rules and regulations to control the evidence and how it is presented.

Mr. Brown: Yes sir."

The Court then asked petitioner if he had discussed his decision to conduct his own defense with his lawyer, to which he responded, "no". When asked by the Court if he wished to discuss the decision with Mr. Morris, petitioner again responded, "no". The Court then entered a finding that the petitioner was an individual of average in-

telligence, able to express himself, and that the motion to proceed *pro se* would therefore be granted. The court then appointed Mr. Morris as an advisor and ordered him to sit with petitioner throughout the trial.

Prior to the openings, petitioner represented himself in a *Sandoval* hearing.[1] The court ruled that on cross-examination of the petitioner as defendant in the coming trial the People could bring out his convictions for burglary and petit larceny, but not for drug offenses.

Before beginning to impanel the Jury the presiding Justice asked petitioner if he still wished to proceed *pro se*. Petitioner responded that he did.[2] Petitioner and counsel for the People then conducted *voir dire*.[3]

At the trial itself, the People's three principal witnesses testified to the following: On December 12, 1974 at 4:30 P.M. petitioner entered Arthur's Roundtable, a bar in the Bronx, and ordered a drink from Diane Jacobs, a barmaid on duty. When asked to pay for the drink, he refused and began physically to harass a female customer and verbally to abuse Ms. Jacobs. Ms. Jacobs became frightened, requested a friend to call her boyfriend, Anthony Wingate, and ask him to pick her up after work. By the time Wingate arrived, petitioner had left the bar. Upon Wingate's arrival, Ms. Jacobs described to him the details of the incident which had prompted her to summon him. She also described the incident to Arthur Johnson, the bar's owner.

When petitioner re-entered the bar, Johnson, hoping to resolve the difficulties between Jacobs and petitioner, asked the latter to come to the back and talk. As petitioner and Johnson were conversing, Wingate approached to speak to petitioner. Johnson requested that Wingate not interfere. Wingate then told petitioner, "The next time my woman tells me you have messed with her, I'm going to blow your brains out." Petitioner immediately re-

---

1. At the *Sandoval* hearing the People argued that all of Mr. Brown's prior arrests should be admissible on cross-examination because the "defendant's criminal background indicates his total and complete disregard of the interest of society and his putting of his own interest above those of society." Petitioner did not object to this incorrect statement of the law.

2. THE COURT: Do you still wish to proceed pro se?
   MR. BROWN: Yes.
   THE COURT: You doing this voluntarily and intelligently?
   MR. BROWN: I'm trying to, sir.
   THE COURT: And you are of the opinion that you possess the necessary qualifications and capabilities to defend yourself?
   MR. BROWN: Yes.
   THE COURT: And that you have had on prior occasions, been a party to prior judicial proceedings and you're familiar with said proceedings?
   MR. BROWN: Yes.
   THE COURT: And that you will, as you've indicated, yesterday, comply with the directions of the Court and that you will comport and conform to the matter and way of doing business in a Courtroom?
   MR. BROWN: Yes.

3. *Defendant's conduct during the voir dire indicated that he was emotionally upset. Throughout a great deal of the voir dire he did not ask questions, but rather testified as to his feelings.
   MR. BROWN: I used to go to Clinton.*

MR. FISCHER: Objection, your Honor.
THE COURT: Sustained. (the voir dire continues.)
MR. BROWN: Yes. My days too, It was fists.
MR. FISCHER: Objection, your Honor.
THE COURT: Sustained.
MR. BROWN: Somebody you never set eyes on before, you never even came in contact with this individual, you just walked up to a stranger and say, "I kill You" that's insanity because there's a lot of crazy people out here today that you can't take on face value. That's why it so much, the rate of death today is so high. Am I making myself clear? I mean, do I get my point across? I don't feel myself that this would happen.
MR. FISCHER: Objection your Honor.
THE COURT: Right. Sustained. Next question. (the voir dire continues).
MR. BROWN: . . . Why is this happening? So a person has got to be very particular on how he handles things today. I even experienced *where elderly women is being robbed, mugged, when I was coming up, my old lady had the utmost respect—*
MR. FISCHER: Your Honor, I object to this line.
THE COURT: Objection sustained. Any further questions, Mr. Brown? Please state your question to the juror that you wish to elicit the information from.
MR. BROWN: Yes, sir.

sponded by shooting Wingate in the head. After Wingate fell to the floor, petitioner fired a second shot into Wingate's face.

After direct examination of the last People's witness the petitioner requested that he be relieved from conducting his defense and that Mr. Morris be re-assigned as his attorney. The Court inquired as to whether he was making this application "knowingly and intelligently." He responded that he was, the Court granted the application, and Mr. Morris began trying the case.

Two eye-witnesses testified for the defense, Wyman Earle and Smiley Vaughn. According to Earle's testimony, on the date of the incident in question Wingate was drunk. Earle saw Diane Jacobs pass an object which looked like a gun to Wingate. He also saw Wingate draw his gun first. A struggle then broke out between petitioner and Wingate and in the midst of the fight two shots rang out.

Smiley Vaughn corroborated Earle's testimony, except that he did not see Wingate holding a gun.

It thus appears that there was no question but that petitioner in fact shot Wingate, and that the critical issue presented to the jury was whether—as the People's witnesses contended—the shooting was a deliberate act or whether—as the defense testimony suggested—it was the unintended result of a barroom brawl precipitated by Wingate's drunken conduct. Needless to say, this was an issue peculiarly unsuited to trial by an amateur, let alone one of the participants in the dispute.

### The Habeas Hearing

The basic question presented by this habeas corpus petition is whether petitioner, in deciding to represent himself at trial, had "knowingly and intelligently" forgone the "traditional benefits associated with the right to counsel", having been made fully "aware of the dangers and disadvantages of self-representation." *Faretta v. California* (1975) 422 U.S. 806, 835, 95 S.Ct. 2525, 2541, 45 L.Ed.2d 562. As our review of the state trial record left us unconvinced that the petitioner had indeed acted in such a know-ing and intelligent manner, we appointed counsel for petitioner and ordered a hearing to determine whether petitioner had in fact, looking at all the circumstances, made such a knowing and intelligent decision. Cf. *United States ex. rel. Konigsberg v. Vincent* (2d Cir. 1975) 526 F.2d 131; *United States v. Rosenthal* (2d Cir. 1972) 470 F.2d 837.

At the start of the hearing petitioner's counsel moved that the writ be sustained as a matter of law on the ground that the state trial record did not affirmatively establish that petitioner had acted in a "knowing and intelligent" fashion. When that motion was denied, petitioner's counsel offered the testimony of two witnesses: Mr. Morris, petitioner's attorney at the state trial (who had been subpoenaed by the Attorney General), and the petitioner himself.

Mr. Morris testified that the petitioner never discussed with him his decision to proceed *pro se* and that it was not until he entered the courtroom to begin trying the case that he learned of the petitioner's desire to conduct his own defense.

Mr. Morris also testified that, even after the petitioner announced in open court that he wished to proceed *pro se,* he did not discuss with him either the dangers of the self-representation or the difficulties involved in this particular case. In fact, when Mr. Morris was pressed by the assistant attorney general as to whether or not he could remember saying anything at all to his client after he had announced his decision to proceed *pro se,* Mr. Morris testified that "I was quite angry, as I indicated before, and I might have uttered a couple of profane terms under my breath. Whether he heard it or not, I don't know. I know that he was reading and reading and reading and reading. I am looking at him. I was shocked. I'm sorry, Ma'am."

When asked by the assistant attorney general if he spoke with his client during the first recess, Mr. Morris responded that he had used that particular recess to go into the robing room with the judge to ask to be

released from sitting in the courtroom and to smoke a cigarette.[4] When asked if he went back to the pen in the course of the day to have a conversation with petitioner, Mr. Morris responded that he did not, but went to a coffee shop instead.[5]

Petitioner's testimony corroborated that of Mr. Morris. He testified that neither the trial judge nor Mr. Morris ever spoke with him, either on or off the record, about his decision to act as his own attorney. When questioned by the court as to why he had decided to proceed *pro se,* he responded, "I don't even think I can answer that myself. I don't know why I did that myself. Just it was emotional . . . It was an emotional time. I was kind of confused. I just proceeded like I did."

Later in his testimony when petitioner was asked by the assistant attorney general if he had wanted to take responsibility for his own defense, he answered that he felt he had no alternative, and that he didn't feel he was getting a "fair shake" from the lawyers or the judge.[6]

Upon all of the foregoing evidence we are inexorably forced to the conclusion that at the time petitioner embarked upon the hazardous course of self-representation he was wholly unaware of the "dangers and disadvantages" of his decision and therefore cannot be said to have "knowingly and intelligently" forgone the "traditional benefits associated with the right to counsel." Such conclusion requires that we sustain the writ.

The decisions in *United States v. Rosenthal, supra,* and *United States ex rel. Konigsberg v. Vincent, supra,* upon which respondent relies, do not support respondent's position. Those cases merely indicate that where the whole record affirmatively establishes that the defendant fully understood the risks and hazards of self-representation a conviction will not be set aside solely because of the trial court's failure formally and explicitly to advise the defendant of what he already knew. As we have seen, no such situation is here presented.

In conclusion the writ is sustained, and the petitioner is directed to be discharged unless the indictment against him be put to trial within 60 days of the entry of this order.

Let the petitioner make an appropriate application for bail pursuant to Rule 23(c) of the Rules of Appellate Procedure.

SO ORDERED.

---

4. Q  Mr. Morris, at the first break there was a recess, I'm sure, during that first day sometime?

   A  I went into the robing room with the judge and I smoked a cigarette with him. I begged him again. I said, "Please, let me go." He said, "No." I said, "How could you do this to me?" He said, "I'm sorry, Al."
   THE COURT: This was off the record in the robing room?
   THE WITNESS: Yes.

5. Q  Did you at any time in the course of that day go back to the pens [sic] to have a conversation with Mr. Brown?

   A  No, I think I went to the coffee shop and drank coffee.

Q  Mr. Morris, did you believe you had any obligation to speak to Mr. Brown about representing himself?

A  Yes.

Q  You did believe that you had—

A  I think that was explained. When he stood up and said this, I think that—I do not know—he was aware of the fact that the case was prepared.

6. During the course of the habeas hearing petitioner indicated that one of the reasons he did not feel he was getting a "fair shake" was that the complainant, Anthony Wingate, was the son of a New York State judge.